UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**CHIRAE CUFFIE,**

                                       **Plaintiff,**

                  **-v-**                                **3:12-CV-1571**

**COMMISSIONER OF SOCIAL SECURITY,**

                                       **Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Peter A. Gorton, Esq.
Lachman, Gorton Law Firm
P.O. Box 89
1500 East Main Street
Endicott, New York 13761
Attorney for Plaintiff

Susan J. Reiss, Esq.
Special Assistant U.S. Attorney
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278
Attorney for Defendant

**Hon. Norman A. Mordue, Senior District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

On July 28, 2009, plaintiff filed applications for disability insurance benefits and supplemental security income ("SSI"), claiming disability beginning July 22, 2008. The applications were initially denied on November 9, 2009. Thereafter, plaintiff filed a written request for a hearing, and a hearing was held on November 22, 2010 before Administrative Law Judge ("ALJ") Elizabeth W. Koennecke. On April 18, 2011, the ALJ issued a decision denying

plaintiff's claim for benefits. (Tr. 12-24). The Appeals Council denied plaintiff's request for review. Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, asking the court to reverse the Commissioner's decision to deny her application for disability benefits. Presently before the court are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 12, 13). For the reasons set forth below, the court concludes that the Commissioner's decision should be reversed and the matter remanded.

## DISCUSSION

**A.     Legal Standard**

The Social Security Act authorizes payment of disability insurance benefits or SSI benefits to individuals with "disabilities." To be considered disabled, a plaintiff must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1832c(a)(3)(A). The Commissioner uses a five-step process to evaluate disability insurance and SSI disability claims:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000).

A Commissioner's determination that a claimant is not disabled will be set aside when the

factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

**B.     Evidence**

Plaintiff had her initial visit with her treating physician Dr. Galu, on April 17, 2007. At this appointment Dr. Galu noted that plaintiff's fibromyalgia probably explained most of her symptoms, and started her on Cymbalta. (Tr. 271-72). Two weeks later Dr. Galu noted that the Cymbalta improved plaintiff's fibromyalgia symptoms. (Tr. 269-70; see also Tr. 268 (noting that the Cymbalta has helped significantly with her symptoms)). On June 22, 2007, plaintiff continued to complain of body pain everywhere. (Tr. 267). In August 2007, plaintiff identified a significant improvement in symptoms and stated she could work without any difficulty.

At Dr. Galu's request, plaintiff was evaluated by Dr. Dura for her long standing history of diffuse musculoskeletal pain on August 31, 2007. (Tr. 232-35). During this visit, plaintiff stated that her pain is everywhere 24 hours a day, and that although it subsides when she takes her medication, in general she feels like an old lady and her job fatigues her and she doesn't have the energy that she would like to have in performing the job. Dr. Dura found that plaintiff appeared to meet the criteria for fibromyalgia. On January 2, 2008, Dr. Galu noted that plaintiff's arthralgia and depression were both worsening, and that all her generalized pain was worsening her depression. (Tr. 261). Two weeks later, Dr. Galu observed significant improvement of her depression and anxiety on Zoloft. A month later, on February 18, 2008, Dr. Galu stated that

plaintiff had a history of fibromyalgia with quite severe symptoms, but has had spectacular improvement with the Zoloft, and was able to work 8 hours without any difficulty. (Tr. 259). On April 21, 2008 Dr. Galu made similar observations. (Tr. 258).

However, at an October 23, 2008 visit, three months after the alleged onset date, Dr. Galu noted that initially when plaintiff started the Zoloft she was significantly better, but now the pain has restarted. (Tr. 256). Dr. Galu continued the Zoloft and also started her on Lyrica. On November 17, 2008, Dr. Galu noted that the Lyrica helped with the pain, and plaintiff was able to work better. (Tr. 255). On January 19, 2009, plaintiff told Dr. Galu that she was working part time but had difficulty with her work because of the excessive pain. (Tr. 253). Dr. Galu stated that plaintiff would be out of work until her next visit in a month. (Tr. 253). On May 7, 2009, Dr. Galu noted that plaintiff had stopped working, was complaining of chronic intermittent joint pain, fatigue and back pain. (Tr. 251).

On July 6, 2009, plaintiff met with Valerie Jones Giles, a social worker, who observed that plaintiff experienced helplessness, hopelessness, suicidal ideations without intent, decreased appetite and anhedonia. (Tr. 242-43). Plaintiff told Ms. Giles that she has had three previous suicide attempts. Ms. Giles found plaintiff oriented to person, place, and time, found that her eye contact was appropriate, her mood and affect anxious, found her to be loquacious with circumstantiality in her thought processes, found her judgment and insight fair, and found her to be of average intelligence. Ms. Giles assessed her to have a GAF[1] score of 50.

---

[1] The GAF is a 100 point scale, and 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," 61-70 indicates individuals that have mild symptoms or some difficulty in social, occupational, or school settings but generally function well, and the 71-80 range is for patients responding appropriately to stress. AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th Ed. Text Revision 2000) (DSM-IV-

On July 7, 2009, plaintiff saw Dr. Galu with anxiety, depression, degenerative joint disease, and fibromyalgia with chronic pain as her issues. Dr. Galu noted that she has been out of work as she still complains of pain, assessed that she would continue the Lyrica and Zoloft and that she would be out of work from July 2nd to October 2nd when they would re-evaluate. (Tr. 250).

On September 2, 2009, plaintiff saw Dr. Russell, a licensed psychologist after being referred by the STAR group for a psychological evaluation. (Tr. 294-99). Dr. Russell described plaintiff's mental health treatment history, noting that she received mental health services from 1990-1993, stopped when she had her son, reentered treatment in 1998 following her second suicide attempt and continued treatment until 2000. At that point plaintiff stopped receiving mental health treatment until her third suicide attempt in 2003, after that she was in treatment until 2005. She began mental health treatment again in 2007 when she moved to the Binghamton area--her primary care doctor placed her on medication. Plaintiff stated that she was emotionally distraught and felt hopeless, angry, and anxious. Dr. Russell observed that she presented herself in an especially negative light, explaining that this response style may represent a "cry for help" and that she may be more likely to attest to many more symptoms than what she may actually experience. Dr. Russell stated that her symptoms must be moderated somewhat by the fact that this woman tended to exaggerate her symptom somewhat for this evaluation. Dr. Russell also assessed her to have a GAF score of 50, found her to be work limited and that she would require extra supports in order to become gainfully employed.

Plaintiff attended a psychiatric evaluation with Dr. Moore on October 26, 2009. (Tr.

---

TR).

300-06). Dr. Moore noted that plaintiff was currently attending Broome County Mental Health where she saw a counselor, Valerie Jones-Giles. Dr. Moore found plaintiff to be generally cooperative and responsive with a generally adequate manner of relating socially, though he noted that her thought process was somewhat rambling in nature. Dr. Moore found her oriented to person, place, and time, found her able to count, do simple calculations and serial 3's. He noted that her cognitive functioning was below average range, and her general fund of information appropriate to experience, he found her insight fair, and her judgment fair to poor. Plaintiff told Dr. Moore that she tries a little bit of cooking, cleaning, and laundry but generally finds her self not doing much because of her medical issues and a lack of energy and motivation. She stated that she is now more withdrawn than she used to be. She further explained that she gets up, gets her son up for school, goes upstairs to take her medicine, and then will go back to sleep after her son leaves for school and generally sleeps until 3. She may watch her grandson for an hour or two when her daughter brings him over. Dr. Moore opined that plaintiff could follow and understand simple directions and instructions, perform simple rote tasks under supervision, and can learn simple tasks. He further opined that she has the ability to learn simplistic and complex tasks, though it may take her longer to learn and retain the complex information. He found that plaintiff appeared to have difficulty dealing with stress and her depression and mood swings may cause problems with relating adequately with others, making appropriate work decisions, and maintaining a regular work schedule.

On the same day, plaintiff attended an independent medical examination with Dr. Magurno. (Tr. 307-12). Plaintiff explained to Dr. Magurno that she has pain all over, and that everything she does makes her pain worse. Plaintiff told Dr. Magurno that she microwaves food

daily; cleans, does laundry, and shops once a month; showers three times a week; dresses daily; watches tv, listens to the radio, and goes out to visit friends and family. Dr. Magurno opined that plaintiff should avoid any strenuous activity, has marked limitations for walking, standing, reaching, pushing, pulling, lifting, and carrying; moderate limitation for bending; mild limitation for fine motor activities; and no observed limitations for sitting, speech and hearing.

On November 6, 2009, A. Hochberg, a state agency psychological consultant opined that plaintiff was able to carry out simple work. Plaintiff visited Dr. Galu on May 5, 2010, after a five-month period where she did not see Dr. Galu. (Tr. 350-51). Dr. Galu noted that plaintiff was not working and was applying for social services benefits. She continued her Lyrica and Zoloft and opined that plaintiff could work part time, with lifting limited to less than 20 pounds. On June 16, 2010, Dr. Galu noted plaintiff was currently not working, and continued the same treatment for her fibromyalgia. (Tr. 391). On August 18, 2010, Dr. Galu observed that plaintiff only experienced minimal improvement with the Lyrica and Zoloft, and that she goes to counseling on a weekly basis for her mental health issues.

**C.     ALJ's Decision**

The ALJ found that plaintiff had not engaged in substantial gainful activity since July 22, 2008, the alleged onset date. (Tr. 15). The ALJ next considered plaintiff's alleged impairments and found that fibromyalgia, mood disorder, and alcohol abuse were severe impairments. (Tr. 15-16). The ALJ then discussed plaintiff's other alleged impairments, noting that there was not enough documentation in the record to show that plaintiff's diabetes mellitus, right-sided carpal tunnel syndrome, migraine headaches, neck and back pain, right-sided swelling, and ganglion cysts rose to the level of severe impairments. (Tr. 16-17). Following the sequential process, the

ALJ analyzed whether plaintiff had an impairment that met or medically equaled one of the listed impairments. (Tr. 17-19). With respect to her mental impairments, the ALJ specifically considered Listings 12.04 and 12.09, finding that the record fails to show that plaintiff satisfied the listing criteria. (Tr. 18-19). With respect to her physical impairments, the ALJ stated "[a]lthough the claimant has a physical impairment which is considered to be 'severe,' it is not attended with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listings." (Tr. 17).

The ALJ then determined that plaintiff had the residual functional capacity to perform sedentary work, in that she is able to lift and/or carry ten pounds occasionally, less than 10 pounds frequently; stand and/or walk for about two hours in an eight hour workday; sit for about six hours in an eight hour workday. The ALJ further determined that plaintiff has the ability to understand, carry out, and remember simple instructions and directions, respond appropriately to supervision, co-workers, and usual work situations and deal with changes in a routine work setting. (Tr. 19).

The ALJ evaluated plaintiff's allegations that she has experienced chronic pain for approximately ten to fifteen years, and as a result of her impairments she is unable to do too much physical work anymore, that she has difficulty moving around after working and experiences chronic pain. The ALJ noted that plaintiff claims that she experiences pain when sitting, standing, and lying down, and that although her doctor told her that MRIs revealed nothing wrong with her back, when she runs for the bus, the whole thing starts to burn along the waist. The ALJ observed that plaintiff has been doing housekeeping and custodial work since 2000 and that she stopped working as a custodian at the local YWCA in 2009 due to her physical impairments.

Describing plaintiff's activities, the ALJ stated that plaintiff is "able to care for her teenage son, go shopping, cook simple meals, take public transportation, run after buses, and baby-sit her grandchild." (Tr. 20). The ALJ also stated that despite her psychiatric symptoms, the evidence "demonstrates that claimant has not pursued mental health treatment; it appears that the claimant is only evaluated by mental health professionals while in pursuit of benefits."

The ALJ then determined that the medical evidence in the record did not support plaintiff's allegations of significant physical limitations, pointing to treatment notes from plaintiff's treating provider, Dr. Galu, observing improvement, and an ability to work. (Tr. 20-21). The ALJ gave Dr. Galu's treatment notes "some weight" explaining that "Dr. Galu did not provide a medical source statement or a proper function-by-function analysis for the claimant's residual functional capacity." (Tr. 21). The ALJ then discussed a consultative exam performed by Dr. Magurno. At the consultative exam, plaintiff reported shortness of breath which Dr. Magurno found to be poorly characterized. Dr. Magurno concluded that plaintiff should avoid strenuous activities and that she has marked limitations for walking, standing, reaching, pushing, pulling, lifting, and carrying, but no limitations for sitting. The ALJ assigned this opinion "limited weight" "because her conclusions appear to be influenced by the claimant's reported shortness of breath, which is not evident anywhere else in the medical record." (Tr. 21).

With respect to plaintiff's mental impairments, the ALJ discussed a consultative exam by Dr. Moore, who found that despite difficulty dealing with stress, plaintiff is able to follow and understand simple instructions and directions, perform simple rote tasks under supervision, maintain attention and concentration, and learn simple tasks; a state agency psychological consultant, Dr. Hochberg's conclusion that plaintiff was "not significantly limited" in most mental

work-related activities and able to carry out simple work; and a psychological evaluation performed by Dr. Russell, who found that "in terms of employability, [plaintiff] is work-limited and will require extra supports in order to become gainfully employed . . . ."  (Tr. 21).   The ALJ concluded that the evidence "consistently shows that the claimant is capable of at least simple, unskilled work."  (Tr. 22-23).

The ALJ concluded that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that her statements concerning the intensity, persistence, and limiting effects of these symptoms were only partially credible.  (Tr. 22).  In support of her conclusion, the ALJ stated that plaintiff's inconsistent work history detracts from her credibility regarding her motivation to work; that she worked as a housekeeper despite the fact that she testified she has experienced significant chronic pain for the past ten or fifteen years; that she went out dancing, showing that she is capable of light exertion and is more social than alleged.

The ALJ then found that plaintiff was unable to perform any past relevant work, but that considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.  (Tr. 23).  The ALJ noted that in addition to her exertional impairments plaintiff has non-exertional impairments but concluded that the additional mental limitations have little or no effect on the occupational base of unskilled sedentary work, and therefore, was able to rely on the Medical-Vocational Guidelines.  Therefore, the ALJ found plaintiff "not disabled."

**D.	Issues In Contention**

Plaintiff argues that: (1) the ALJ erred by failing to properly consider plaintiff's

-10-

fibromyalgia; (2) the ALJ's RFC determination is not supported by substantial evidence; and (3) the ALJ erred by failing to elicit testimony from a vocational expert.

### 1. Fibromyalgia

Plaintiff argues that the ALJ and the Appeals Council failed to appropriately address plaintiff's fibromyalgia and did not address the impact of Social Security Ruling 12-2p.[2] More specifically, plaintiff asserts that at the listings stage of the analysis, the ALJ did not discuss plaintiff's fibromyalgia.

Under the regulations, the ALJ's determination as to whether the claimant's impairment meets or equals the Listings must reflect a comparison of the symptoms, signs, and laboratory findings about the impairment, as shown in the medical evidence, with the medical criteria shown with the listed impairment. *See* 20 C.F.R. § 416.926. Where a claimant has alleged several impairments, the ALJ is obligated to consider the disabling effect of the combination of the impairments without regard to whether any one impairment, if considered separately, would be disabling. *Id.*; *see also* 20 C.F.R. § 404.1523. "'In such instances, it is the duty of the [ALJ] to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled.'" *Costanzo v. Apfel*, 2000 WL 575660, at *3 (W.D.N.Y. Feb. 8, 2000) (citing *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984)). Because fibromyalgia is not a listed impairment, the Commissioner evaluates whether the impairment "meets or medically equals one of the listed impairments." 20 C.F.R., Pt 404, Subpt. P, App. 1, *Galowitz v. Astrue*, 11 Civ 2259, 2012 WL 4762563, at *2

---

[2] The Court notes that, as plaintiff and defendant recognize, SSR 12-2p was not issued until after the ALJ's decision. Therefore, it is not specifically applicable to plaintiff's case.

-11-

(S.D.N.Y. Aug 20, 2012). A finding of disability based on fibromyalgia is determined by evaluating "a positive tender point test, plaintiff's subjective complaints of pain and fatigue, and her treating physician's determination as to the severity of her impairments and her ability to function." *Battaglia v. Astrue*, 11 Civ. 02045, 2012 WL 1940851, at *8 (E.D.N.Y. May 29, 2012) (citing *Green-Younger v. Barnhart* 335 F.3d 99, 106-07 (2d Cir. 2003)).

The ALJ's discussion of whether plaintiff's physical impairments meet or equal one of the listings consists of a single sentence in which she states: "Although the claimant has a physical impairment which is considered to be 'severe,' it is not attended with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listings." The Court concludes that this explanation is insufficient. The ALJ did not provide any discussion of plaintiff's fibromyalgia, alone, or in combination with plaintiff's other alleged impairments, at this step of the analysis. Similarly, the ALJ did not identify which, if any, specific listings she considered. It is likewise unclear what "clinical signs and diagnostic findings" the ALJ required at this stage, particularly in light of the fact that plaintiff's alleged severe impairment is fibromyalgia, a "disease that eludes [objective] measurement." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003). Indeed, the ALJ determined, at step 2, that plaintiff did have fibromyalgia, and that it was a severe impairment. A court "cannot . . . conduct a review that is both limited and meaningful if the ALJ does not state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered." *Morgan on Behalf of Morgan v. Chater*, 913 F. Supp. 184, 188-89 (W.D.N.Y. 1996). Consequently, the Court finds that remand is necessary for the ALJ to provide further explanation as to whether plaintiff's physical impairments meet or medically equal a listing.

**2.     RFC Determination**

Plaintiff next argues that the ALJ improperly assessed the evidence in the record and improperly failed to request additional information from plaintiff's treating physician, resulting in an RFC determination that is unsupported by substantial evidence.

A plaintiff's RFC is the most he can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. "A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citation omitted). In determining RFC, the ALJ can consider a variety of factors, including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments. 20 C.F.R. § 404.1545(a).

The Court agrees with plaintiff that the ALJ erred by failing to develop the record. An ALJ has an affirmative duty to develop the record. *See, e.g., Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). The regulations provide that the Commissioner will make every reasonable effort to obtain medical reports from a claimant's medical sources, including a statement about the claimant's capabilities in light of her impairments. *See* 20 C.F.R. § 404.1512; *id.* at § 404.1513(b)(6). Additionally, Social Security Ruling 96-5p provides that "[a]djudicators are generally required to request that acceptable medical sources provide [medical source] statements with their medical reports." The duty to develop the record is "particularly important" when obtaining information from a claimant's treating physician due to the "treating physician"

-13-

provisions in the regulations. *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172 (S.D.N.Y. 2002).

It is true, as defendant observes, that an ALJ is not required to seek additional information "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history.'" *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999); *see also, Aldrich v. Astrue*, 5:08-CV-402, 2009 WL 3165726, at *7 (N.D.N.Y. Sept. 28, 2009) (a treating physician is recontacted only in situations where the evidence from treating or other medical sources is insufficient for the ALJ to determine whether a claimant is disabled). However, after reviewing the record, and under the circumstances presented here, the Court concludes that the ALJ should have requested a medical source statement from Dr. Galu.

As an initial matter, a medical source statement would have been particularly helpful in this case due to the fact that plaintiff's main physical impairment was fibromyalgia, a "disease that eludes [objective] measurement." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003). The only diagnostic techniques that could have supported a finding of disability were a positive tender point test, plaintiff's subjective complaints, and her physician's determination as to the severity of her impairments and ability to function. The record demonstrates a positive tender point test, and a general recognition that plaintiff does suffer from fibromyalgia. Plaintiff certainly complained throughout the record of pain. Therefore, the opinion of her treating physician as to the severity of her fibromyalgia and her ability to function, would have been particularly relevant. Moreover, the ALJ commented on the lack of a medical source statement multiple times in her determination. Indeed, she even appears to have assigned lesser weight to the opinion of Dr. Galu because of the lack of a medical source statement. Although the record contains many treatment notes from Dr. Galu, the treatment notes are all relatively brief. They

-14-

are also not entirely clear regarding plaintiff's ability to work. For example, as described in detail above, in many notes Dr. Galu notes that plaintiff is out of work, states that she will be out of work for a certain amount of time and then reevaluated, but then in May 2010, she opines that plaintiff can work part-time with restricted lifting. In light of these facts, and the ALJ's apparent concern over the lack of a medical source statement from Dr. Galu, the Court finds that remand is appropriate.[3]

With respect to the ALJ's RFC determination relating to plaintiff's mental impairments, the Court finds no error. The ALJ limited plaintiff to unskilled work–that only requires the ability to understand, carry out, and remember simple instructions and directions. Plaintiff first contends that the ALJ's statement that plaintiff only pursues mental health treatment when seeking benefits is incorrect. It appears based on plaintiff's representations to medical providers, that between 1990 and the present, there are periods where plaintiff was in treatment, and then years when she was not. When she moved to Binghamton in 2007, although there are not records from a mental health provider, her treating physician prescribed her medications that helped with her mental impairments. It does appear to this Court that during the relevant period, plaintiff was receiving some type of mental health treatment, and the ALJ did discuss the evidence in the record regarding this treatment. Plaintiff also argues that the ALJ "cherry picks" the record. The Court disagrees. As defendant points out, Dr. Moore opined that despite plaintiff's limitations, she

---

[3] Plaintiff has pointed to a number of specific instances in the record where she believes the ALJ misinterpreted the evidence leading to a physical RFC determination that is not supported by substantial evidence. For example, she argues that the ALJ should not have disregarded the limitations provided by consultative examiner Dr. Magurno, which the ALJ believes were influenced by plaintiff's reported shortness of breath. On remand, the ALJ will be able to re-evaluate this information, with a medical source statement from plaintiff's treating physician, therefore, the Court does not address each of these arguments separately.

-15-

could follow and understand simple instructions and directions; perform simple rote tasks under supervision; learn simple tasks; and maintain attention and concentration. (Def. Br. at 21). Similarly, Dr. Hochberg concluded that plaintiff was able to carry out simple work. The ALJ relied on the opinion of Dr. Russell who described her as "work limited," but noted that she had success in the past working, and did not opine that she was unable to work, but that she would require additional supports. Moreover, the Court observes that plaintiff does not appear to claim that her mental health issues have worsened, and she was able to work with these issues in the past. Indeed, at the hearing, when asked if it was her physical problems, emotional problems, or a combination of the two that prevent her from working, plaintiff stated that it was a combination, "but more physical." (Tr. 37). Consequently, the Court finds that the ALJ's mental RFC determination is supported by substantial evidence.

### 3. Vocational Expert

Once the plaintiff shows that she cannot return to her previous work, the Commissioner bears the burden of establishing that she retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383) (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subt. P, App. 2. Each category has its own Grid which takes into account the claimant's age, education, and work experience. Based on these factors, the Grids indicate whether the plaintiff can engage in any other substantial gainful work which exists in the national economy.

Generally, the result listed in the Grid is dispositive on the issue of disability. However, an ALJ may not rely solely on the Grids when non-exertional limitations "significantly diminish" plaintiff's ability to work so that the Grids do not fully address plaintiff's limitations. *See, e.g.*, *Vargas v. Astrue*, 10 Civ. 6306, 2011 WL 2946371, at *13 (S.D.N.Y. July 20, 2011). Consequently, where the nonexertional limitations "significantly limit" the range of work permitted by the exertional limitations, or when exertional impairments do not fit squarely within grid categories, the ALJ is required to consult with a vocational expert. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010); *see also Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."). The ALJ's determination of whether the impact of the nonexertional limitations "significantly limits" the range of work must be supported by substantial evidence. *See Bapp*, 802 F.2d at 605.

Here, the ALJ relied exclusively on the Grids, concluding that plaintiff's additional limitations would not impact the occupational base for sedentary, unskilled work. As discussed above, the Court concludes that the ALJ's RFC determination with respect to plaintiff's mental impairments was supported by substantial evidence. Because the ALJ found that plaintiff's non-exertional limitations had little or no effect on the occupational base of unskilled work, the ALJ properly relied on the Medical-Vocational Guidelines.

**E.     Remedy**

Sentence four of 42 U.S.C. § 405(g) provides that "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

-17-

reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." *Kirkland v. Astrue*, 06-CV-4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008). In light of the errors and unresolved inconsistencies discussed above, it is recommended that the case be remanded for further proceedings consistent with this decision.

## CONCLUSION

For these reasons, it is therefore

ORDERED that the Commissioner's motion for judgment on the pleadings (Dkt. No. 13) is DENIED; and it is further

ORDERED that plaintiff's motion for judgment on the pleadings (Dkt. No. 12) is GRANTED; and it is further

ORDERED that the Commissioner's decision is reversed and this matter is remanded; and it is further

ORDERED that the Clerk of the Court is directed to enter judgment for plaintiff.

IT IS SO ORDERED.

Date: March 15, 2016

Norman A. Mordue
Senior U.S. District Judge

-18-